UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

CHRISTOPHER D. KUBINSKI,

Plaintiff,

v.

MT. HOOD COMMUNITY COLLEGE, GALE BLESSING, an individual, KELLY KEITH, an individual, JOHN SYGIELSKI, an individual, MARC GOLDBERG, an individual, CHRISTIE PLINSKI, an individual, and SHERI MOSHER, an individual,

Defendant.

Case No. 3:14-cv-1155-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Christopher D. Kubinski ("Kubinski"), filed this action against defendants Mt. Hood Community College ("College"); Gale Blessing ("Blessing"); Kelly Keith ("Keith"); Marc Goldberg

("Goldberg"); and Christie Plinski ("Plinski") (collectively "Defendants"),[1] alleging claims for violation of the First Amendment and state whistleblower statutes, and for breach of contract.[2] Defendants move for summary judgment based on the relevant statutes of limitation, the absence of a causal connection between Kubinski's protected activity and Defendants' retaliatory conduct, and Kubinski's failure to satisfy a condition of, or perform pursuant to, the parties' contract.

The court finds Kubinski may rely only on retaliatory actions occurring after July 1, 2012, that he has failed to establish his protected activity was a substantial factor in Defendants' retaliatory actions, and that the relevant contract language is ambiguous. Accordingly, Defendants' motion for summary judgment is granted with regard to Kubinski's First Amendment and state whistleblower retaliation claims, and denied with regard to his breach of contract claim.

*Preliminary Procedural Matter*

Evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. FED. R. CIV. P. 56(c) (2015). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a) (2015). Evidence that is not properly authenticated will not be considered by the court when reviewing a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

In *Orr*, the Ninth Circuit addressed the requirements for authenticating a deposition:

---

[1]Kubinski also named John Sygielski ("Sygielski") and Sheri Moser ("Moser") as defendants but agreed to the dismissal of these two defendants in his opposition briefing.

[2]Kubinski agreed to dismiss his Fifth Claim for Relief for wrongful termination in its entirety.

> A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent. See Fed. R. Evid. 901(b); Fed. R. Civ. P. 56(e) & 30(f)(1). Ordinarily, this would be accomplished by attaching the cover page of the deposition and the reporter's certification to every deposition extract submitted. It is insufficient for a party to submit, without more, an affidavit from her counsel identifying the names of the deponent, the reporter, and the action and stating that the deposition is a "true and correct copy." Such an affidavit lacks foundation even if the affiant-counsel were present at the deposition.

*Orr*, 285 F.3d at 774 (footnote and case citations omitted).

Kubinski has offered deposition excerpts in his opposition materials. The excerpts are identified by Kubinski's counsel in her declaration as "certified true copies of excerpts from the transcript of the deposition" of the relevant deponent. (Oberlin Decl. ¶¶ 2-8.) The excerpts are accompanied by the required cover page, indicating the date of the deposition, the party being deposed, the case for which the deposition was taken, and the reporter, but not a reporter's certification. In light of the provision of the cover page, the certification by Kubinski's counsel the excerpts are certified true copies of the identified depositions, and a lack of objection by Defendants, the court will consider the excerpts properly authenticated.

*Background*

Kubinski moved to Portland, Oregon, in 1999 and was hired by the College shortly thereafter. (Kubinski Dep. 11:7-21) At that time, the College was partnering with Multnomah County Corrections (the "County") to provide Adult Basic Education[3] and English as a Second Language instruction to residents of the Inverness Jail (the "Program"). (Oberlin Decl. Ex. 8, at 3.) The College assigned Kubinski to the Program, where he worked as an instructor and coordinator for

[3]The terms "Adult Basic Education" or "ABE" and "Adult Basic Skills" or "ABS" are used interchangeably by the parties and in this Opinion and Order.

more ten years. (Oberlin Decl. Ex.16, at 8.)

Kubinski, a Canadian citizen, must obtain a visa to work within the United States. (Oberlin Decl. Ex. 31; Blessing Dep. 115:9-11.) The College cooperated with Kubinski to provide him the paperwork necessary to obtain a work visa on an annual basis. (Blessing Dep. 115:9-13; Mosher Dep. 50:3-17.)

Kubinski described his relationship with one of his supervisors, Joyce Coleman, a Dean for the College ("Coleman"), as "very poor" from almost the very beginning. (Kubinski Dep. 21:17-20.) He testified Coleman was "very condescending to him, and he felt "unduly pressured and harassed." (Kubinski Dep. 21:17-22.) Coleman sent Kubinski "pretty nasty emails," accusing him of abdicating his responsibilities, being noncompliant, and unacceptable. (Kubinski Dep. 22:4-16.) Kubinski indicated Coleman micro-managed his work yet withheld information which would assist him in doing his job, made disparaging comments about Kubinski to those he worked with, and criticized his work and character in public. (Oberlin Decl. Ex. 9, at 1-2.) Kubinski also referred to "evidence of particular patterns of behavior used by Dean Coleman which have lead to common experiences of harassment" involving other College and County employees. (Oberlin Decl. Ex. 9, at 4-5.)

On September 22, 2008, the Faculty Association ("Association") filed a grievance on Kubinski's behalf alleging harassment based on Coleman's conduct. (Kubinski Dep. 20:14-24; 23:9-13.) In a written statement prepared by Kubinski for the initial grievance meeting, which occurred on October 13, 2008, he also expressed concern with regard to the College's new methodology to track student attendance, which he alleged resulted in inflated numbers used to increase FTE levels and, consequently, revenue. (Kubinski Dep. 45:5-23; 59:17-21; Oberlin Decl. Ex. 9, at 1, 8.).) Kubinski did not pursue the grievance beyond the initial grievance meeting and the matter was

eventually dismissed. (Kubinski Dep. 23:14-24.)

In late 2008, Paul C. Hill, Special Assistant to the President of the College, investigated the future of the Program, and gathered information from similar programs in Oregon and six other states. (Oberlin Decl. Ex. 8, at 3.) In a report dated January 9, 2009, Hill recommended continuing the Program only if specific conditions were met. (Oberlin Decl. Ex. 8, at 2.) The specific conditions included elimination of the full-time faculty coordinator and part-time clerk positions; addition of a full-time instructional assistant to facilitate registration, develop schedules, and coordinate with College and jail staff; increasing the number of part-time instructional staff; assigning a part-time testing center employee to conduct GED testing; and generating at least $50,000 in revenue to allow the College to recoup in-direct charges and administration costs (the "Hill Report"). (Oberlin Decl. Ex. 8, at 2.) The Hill Report explained this recommendation assured "the financial viability of the program." (Oberlin Decl. Ex. 8, at 2.) Specifically:

> These changes will allow the program to provide all services required under the contract and potentially provide additional hours of service, while reducing or eliminating the need for a contribution from the College's general fund. These changes should also result in less time required of the dean spent on-site at the jail, reducing the College's in-kind contribution to the program.

(Oberlin Decl. Ex. 8, at 2.) The Hill Report contained four additional recommendations contingent on the implementation of the first recommendation. (Oberlin Decl. Ex. 8, at 2.)

The Hill Report acknowledged existing staffing levels were adequate to meet the County's requirements but expressed concerns about the current full-time coordinator, noting:

> [C]ontinuing issues have arisen this past year regarding the responsibilities and accountability of the full-time coordinator. This issue is made more complex due to the fully off-campus duties of the coordinator and minimal oversight by previous deans. Discussions with the coordinator indicate a lack of clarity regarding the nature of the partnership and the coordinator's role and accountabilities as a college

employee.

(Oberlin Decl. Ex. 8, at 3.) Additionally, the Hill Report recognized "the College's expenses have increased faster than the County's contract, resulting in the need to supplement this program by $25,000 in both FY2008 and FY2009." (Oberlin Decl. Ex. 8, at 3.)

Based on the Hill Report, and additional input from the College's board of directors, Sygielski, then President of the College, decided to not renew the Program effective the end of the 2008-09 academic year. (Sygielski Decl. ¶ 3.) Sygielski wanted to focus on the College's core mission of educating students in on-campus programs and felt the economic downturn made it impossible for the College to continue to offer the educational support services as well. (Kubinski Dep. 42:1-8; Sygielski Decl. ¶ 3.)

In a January 21, 2009 email, Coleman advised Kubinski he would placed on paid administrative leave while the College reviewed information and conducted further investigation into "issues and concerns that have been raised by staff regarding work-related matters." (Oberlin Decl. Ex. 10.) Two months later, Blessing, the College's Director of Human Resources, informed Kubinski his non-tenured contract for academic year 2009-10 would not be renewed as "the result of a program change to the educational program at Inverness Jail which will eliminate the instructor/coordinator position" and that he was no longer needed for Spring term 2009 based on a reduction of staff. (Oberlin Decl. Ex. 12.) Blessing advised Kubinski he would "have the right to recall for three years as well as the other provisions provided to non-district-funded employees." (Oberlin Decl. Ex. 12; Blessing Decl. ¶ 2.)

In April 2009, the Association filed an informal grievance on Kubinski's behalf alleging the investigation and resulting paid administrative leave violated the relevant collective bargaining

agreement. (Oberlin Decl. Ex. 11.) On June 10, 2009, Blessing reported the existence of "irreconcilable differences between the investigatory findings and Mr. Kubinski's response" resulted in no disciplinary action against Kubinski, the exclusion of any reference to the administrative leave and investigation from Kubinski's personnel file, and the termination of the Association's grievance. (Oberlin Decl. Ex. 11.) Kubinski returned from paid administrative leave effective June 10, 2009. (Oberlin Decl. Ex. 11.)

On June 11, 2009, Kubinski advised Byron Moore, the County's Program Administrator ("B. Moore"), he had been taken off administrative leave and could return to work. (Oberlin Decl. Ex.15, at 6-7.) In a return email, B. Moore explained to Kubinski the College had decided to not renew the Program, the existing contract would terminate June 30, 1990, and the services provided by the College effectively terminated at the end of Spring Quarter, which was the following day. (Oberlin Decl. Ex.15, at 6.) The next day, Kubinski represented to B. Moore by email it appeared the College had breached its contact with the County by failing to provide classroom instruction during the 2008-2009 school term as a result of Kubinski's suspension . (Kubinski Dep. 28:18-22; 29:5-11; 30:5-17; Oberlin Decl. Ex.15, at 4.) Kubinski suggested the County was entitled to a refund of "upwards of $50,000" as a result of his leave, gaps in services the previous summer, and reduction of tutor hours. (Oberlin Decl. Ex.15, at 4-5.) An email string containing Kubinski's allegations was forwarded to Blessing on June 16, 2009. (Oberlin Decl. Ex.15, at 2.) The same day, Blessing advised Kubinski by email: "The college did not breach its contract with MCSO and worked with MCSO staff to ensure educational services were provided. It is inappropriate for you to communicate otherwise to MCSO or any other individual or organization. Please stop." (Oberlin Decl. Ex.15, at 1-2.)

While the record contains no direct evidence, it appears, based on an opinion issued by

Martin Henner ("Henner") on March 1, 2011, the Association filed a grievance on Kubinski's behalf alleging the College's failure to recall Kubinski in 2010 violated the terms of the collective bargaining agreement. (Oberlin Decl. Ex 16.) Henner found the College violated the collective bargaining agreement when it failed to offer Kubinski a position for an adult basic skill instructor on campus when it became available in 2010. (Oberlin Decl. Ex.16, at 2.) In doing so, Henner rejected the College's position that Kubinski, who had taught only small groups of six to eight adults at an off-campus facilities, was not qualified for the on-campus position under the terms of the collective bargaining agreement. (Oberlin Decl. Ex.16, at 6.) Henner required the College to recall Kubinski to an Adult Basic Skills instructional position, and make Kubinski "whole for his loss of wages, benefits, and any other perquisites of employment he would have received. (Oberlin Decl. Ex.16, at 11.)

The College immediately pursued avenues to incorporate Kubinski into the teaching schedule for Spring term without displacing other veteran teachers, find appropriate office space, and prepare for Kubinski's tenure application it expected he would file in the Fall. (Oberlin Decl. Ex.17.) In an email dated March 20, 2011, Kubinski sought information about the timing of processing his back pay and benefits; the position, pay scale, sick days and insurance applicable to his new employment; and a time frame for his relocation, preparation time for lesson plans, and related teaching and administrative tasks, from Goldberg, then Dean of the College's Adult Basic Skills Department, as well as others. (Oberlin Decl. Ex.18; Goldberg Decl. ¶ 3.) Goldberg forwarded Kubinski's email to Larkin Franks with the notation: "FYI. The headache begins." (Oberlin Decl. Ex.18, at 1.) Again, there is no direct evidence in the record but it appears Kubinski taught Adult Basic Skills classes on the College's campus in during the Spring and Fall terms of 2011 without any issues.

In late 2011, the Association initiated discussions with the College regarding Kubinski's entitlement to tenure. (Kubinski Dep. 71:14-17.) At the request of the Association, Kubinski prepared a summary of his experience, which at that time was limited primarily to his involvement in the Program, and provided it to Plinski, Vice-President of Instruction for the College, in November 2011. (Kubinski Dep. 71:19-22; Plinski Decl. ¶ 21.) The summary described Kubinski's educational background; teaching experience in the Program, community colleges, a university, and the private sector in the United States, Australia, Canada, and the United Kingdom; various positions in administration, management, and social work; and service in the Army. (Oberlin Decl. Ex.26.) Kubinski referenced several student evaluations and faculty evaluations, but did not provide copies indicating they were destroyed or misplaced by the College. (Oberlin Decl. Ex. 26, at 7-8.) He did provide copies of other evaluations, including: (1) a faculty evaluation on College letterhead dated June 2, 1999, describing Kubinski as an "effective faculty member and program coordinator" and "a valuable asset to the adult education program;" (2) an undated letter on College letterhead in which Merced Flores, identified as the Dean of the College's Adult and High School Community Learning Program ("Flores"), thanks Kubinski for his leadership and service in the Program; (3) an immediate supervisor evaluation which appears to be dated April 20, 2006, performed by Flores, who described Kubinski "as a fine individual and outstanding instructor" who "runs an effective program at Inverness and has an excellent relationship with the staff and administration of Multnomah County"; (4) a 2005-06 full-time faculty evaluation dated May 23, 2006, in which Flores congratulates Kubinski on a successful academic year and describes his service to the College, division and department as "invaluable"; (5) a letter dated May 18, 2001, on Multnomah County Sheriff's Office letterhead from Robert C. Vanderbeck, a corrections counselor and GED examiner,

commending Kubinski's attitude, professionalism, and supervisory and motivational skills with regard to the Program; and (6) a letter of introduction dated December 15, 2008, from Gary P. Simmons, Programs Administrator, on Multnomah County Sheriff's Office letterhead, describing Kubinski's involvement in the Program, commending his work ethic, dependability, and social skills, and stating "Kubinski would be an asset to any organization that is involved in the areas of services to the public." (Oberlin Decl. Ex. 26, at 10-16; 20.) At the direction of the Association, Kubinski did not otherwise participate in his tenure process. (Kubinski Dep. 75:2-17.)

On January 6, 2012, Plinski issued a memorandum to Dr. Michael Hay, President of the College, indicating a complete lack of information regarding Kubinski's teaching and professional activities, as well as a lack of faculty support, prevented Plinski from recommending Kubinski for tenure at that time. (Oberlin Decl. Ex.24.) The Association objected in an undated letter, asserting Kubinski had been employed by the College for more than twelve years, with annual renewals of his contract and exemplary evaluations, all evidenced by the "review of employment" documents submitted by Kubinski to Plinski the end of 2011. (Oberlin Decl. Ex. 22.) The Association suggested student evaluations and two peer class observations be collected over the course of Winter and Spring terms 2012 and added to the existing reports on Kubinski's work during the preceding twelve years, thereby providing the College with sufficient information to recommend tenure. (Oberlin Decl. Ex.22.) While it is unclear if the College accepted the Association's suggestion, Kubinski did not receive tenure at this time.

Kubinski apparently taught Adult Basic Education classes Winter term 2012 and expressed an interest in teaching English as a Second Language rather than, or in addition to, Adult Basic

Education in Spring term 2012. Goldberg[4] commented on Kubinski's request in a March 2, 2012 email to Plinski with a copy to Keith[5] stating: "We figure he's doing this b/c of the student complaints from ABE-GED and probably b/c ESL students are even more vulnerable that ABE-GED and less likely to complain." (Oberlin Decl. Ex. 20, at 2.) Plinski forwarded the email to Ursula Irwin ("Irwin")[6] with the comment: "Know that Marc really is looking for termination." (Oberlin Decl. Ex. 20, at 1.) Irwin responded: "He is, but he needs to give us more. We asked him to record the complaint[s] that have been coming in. We will need that documentation." (Oberlin Decl. Ex. 20, at 1.)

In a March 26, 2012 letter signed by Plinski on behalf of Hay, the College advised Kubinski it would not be renewing his contract for the 2012-13 academic year and that his employment would terminate June 30, 2012, at the conclusion of Spring term 2012. (Kubinski Dep. 90:19-21; Oberlin Decl. Ex. 27.) Kubinski suffered a breakdown in April 2012. (Kubinski Dep. 89:24-90:1.) Goldberg, Kubinski's supervisor, attempted to reach Kubinski by telephone. (Kubinski Dep. 90:2-6) On April 6, 2012, Kubinski emailed Goldberg and requested Goldberg not contact him by phone or email. (Kubinski Dep. 89:13-23.) He told Goldberg he "just couldn't cope anymore" and he "wasn't going to be in." (Kubinski Dep. 90:3-6.) Consequently, it appears Kubinski did not teach at the College in Spring term 2012.

The Association grieved the non-renewal notice on Kubinski's behalf and the parties engaged

---

[4]Goldberg became Dean of the Colleges Workforce and Adult Education Department in July 2011. (Goldberg Decl. ¶3.)

[5]The record reveals Keith was an employee of the College, but not Keith's position at this time. (Keith Decl. ¶ 2.)

[6]Irwin's position with the College is unclear.

in settlement discussions. (Kubinski Dep. 90:22-24.) In an April 14, 2012 email addressed to Goldberg, Keith, and Irwin, Plinski described a settlement in which Kubinski would be limited to teaching ABE/GED classes and required to complete Oregon Pathways Adult Basic Skills ("OPABS") training at the same level as other ABE/GED faculty. (Oberlin Decl. Ex. 28, at 2.) OPABS is a state-created curriculum adopted by the College in 2012 and fully implemented by 2013. (Plinski Decl. ¶ 4.) State officials will not release curriculum materials to instructors who have not received the requisite OPABS training. (Goldberg Decl. ¶3.)

Goldberg responded by email on April 17, 2012, as follows:

> Hi Christie,
>
> Here's an outside the box thought that Kelley and I were talking about today. When Chris K. comes back, if at any point he does not make tenure (meaning now or in a year or two years), he's going to revisit the idea that the ABS division has never welcomed him back because of the past grievance, etc. We know that excuse is coming whenever this goes down.
>
> Considering that Chris has limited coursework in teaching Adult Basic Skills (go figure?!), what if he taught in another division? I've attached all of his transcripts. When Kelley asked this question on Friday, the response was that there's no budget for him to go to another division. So, what if his budget from ABS was moved with him to another discipline? Since we would lose a staffing position in ABS/EWD, one way to balance things out would be to move Denise Georgoff from the library to ABS. Jeff Ring and I have had some initial conversations about her fit in the LC so maybe ABS/EWD is better for her and another academic discipline is better for Chris K?
>
> This may be a crazy thought. The concern from my side (and I believe Kelley's) is that if Chris is coming back and we need to spend the time and energy need to dot all i's and cross all t's twice with Chris, we will have a much harder time "moving mountains" to get the extremely dysfunctional ABS division (even without Kubinski) to a place where it demonstrates sufficient transition outcomes that clearly show the value of ABS. We desperately need more full-time faculty which didn't go through and the existing FT faculty are resistant to OPABS, resistant to doing ED Assessment, resistant to doing strategic planning meaningfully and have no interest in helping do PT faculty evaluations for the 25+ PT faculty that made the list without

ever being evaluated. Our work is already cut out for us.

I don't mean to be melodramatic here . . . it just becomes much more difficult to get the department where we know it needs to be in the future for the program viability with the headache of Kubinski ahead of us.

(Oberlin Decl. Ex. 28, at 1-2.)

The parties settled the grievance in December 2012. (Kubinski Dep. 90:25-91:1; Oberlin Decl. Ex. 29.) Kubinski and the College executed a settlement agreement (the "Agreement") containing the following terms:

- Dr. Kubinski will be reinstated and resume employment with MHCC effective with the beginning of Spring Term 2013. Instructor Kubinski will be considered on leave without pay for Fall and Winter Terms, 2012-13.
- Fall Term 2013 would commence Dr. Kubinski's years 2 tenure track position in ABE/GED as per Article 16 of the Collective Bargaining Agreement and with a strong emphasis on instruction, instructional training and development;
- Dr. Kubinski's assignment shall be in ABE/GED, exclusive of ESL or ENL. He will teach OPABS courses similar to his faculty peers in the ABE/GED program. The College will provide Dr. Kubinski with any required training upon his return to work, and he will not be required to teach any courses that he is not qualified to teach;
- If successful in his Year 2 instruction and professional work, and with the recommendations of his tenure committee and the tenured peer faculty group, Dr. Kubinski would then advance into year 3 of the tenure track process and follow successive years thereafter;
- Dr. Kubinski will participate in professional development as recommended by his dean, the tenure committee and tenured peer faculty group;
- Dr. Kubinski will be mentored by a tenure track committee composed per recommendations in Art. 16 of the Collective Bargaining Agreement. This committee will function as identified in Article 16 and the Tenure Process Manual;
- The Faculty Association will support the work and recommendations of Dr. Kubinski's tenure committee and the tenured peer faculty group;
- Dr. Kubinski agrees to complete the Evaluation Matrix, identify courses to use in gathering student ratings, choose colleagues for colleague reviews of course materials and peer observations in consultation with his/her dean and complete a self report, pursuant to Article 16D(2), in the spring term of 2013.
- Dr. Kubinski will follow the tenure evaluation application instructions as

> stated in the tenure evaluation manual. He will fully inform himself of the process and responsibilities therewith. Dr. Kubinski understands that the failure to abide by any requirement or deadline contained in this agreement or in Article 16 could negatively impact the tenure process, and could lead to a denial of tenure, consistent with the requirements of any other tenure-track faculty member.

(Kubinski Dep. 90:25-91:1; Oberlin Decl. Ex. 29.)

On January 15, 2013, Kubinski complained to the Oregon Government Waste Hotline ("Hotline") the College had inflated student hours reported to the State over a four-to-six year span, resulting in payments exceeding amounts actually due the College. (Bond Decl. ¶ 1-2, Ex. 1; Moore Decl. ¶ 2.) Dale Bond, Audit Manager for Oregon's Secretary of State ("Bond"), investigated the complaint, found it to be untimely, and took no action. (Bond Decl. 2-3.) Bond subsequently forwarded the complaint to David Moore, Interim Education Division Director in the Oregon Department of Community Colleges and Workforce Development and Director of Adult Basic Skills ("D. Moore"). (Bond Decl. ¶ 3; Moore ¶¶ 1-2; Oberlin Decl. Ex.19.) Neither Bond nor D. Moore discussed the complaint with anyone at the College and are not aware anyone else from their offices did so. (Bond Decl. ¶ 4; Moore ¶ 4.) Plinski, Blessing, Goldberg, and Keith were not aware Kubinski reported wrongdoing by the College to the Hotline before this action was filed. (Plinski Decl. ¶ 7; Blessing Decl. ¶ 3; Goldberg Decl. ¶ 3; Keith Decl. ¶ 6. )

On January 28, 2013, Keith, newly designated as Dean of Adult Basic Skills for the College, emailed Kubinski a schedule of ABE-GED classes to be offered Spring term 2013 and asked him to indicate which sections he would be interested in teaching by February 4, 2013. (Oberlin Decl. Ex. 35, at 4; Keith Decl. ¶ 2.) Other than inquire about how many hours he would be required to teach, Kubinski did not respond to the request for a list of classes before February 4, 2013. (Oberlin

Decl. Ex. 35, at 3-4.)

Keith also reminded Kubinski that starting Spring term 2013, all ABE-GED classes would be OPABS and requested Kubinski provide his availability over the next seven weeks for OPABS training by the February 4, 2013, deadline as well. (Oberlin Decl. Ex. 35, at 4.) Every instructor in the College's Adult Basic Education program had completed OPABS training by Spring term 2013 except Kubinski, who completed only two of the required OPABS courses in early 2012. (Kubinski Dep. 93:4-20; Oberlin Decl. Ex. 34, at 1; Keith Decl. ¶ 2.) Kubinski was aware the College required all instructors teaching ABE/GED classes to receive OPABS training but thought he would be able to teach certain classes immediately without completing the OPABS training. (Kubinski Dep. 95:2-96:25-91:1; Plinski Decl. ¶ 4.)

Kubinksi advised Keith by email on February 3, 2013, he was not in the United States at that time, would need health insurance to cover him while engaged in work-related activities, and "other related logistics . . . would need to be addressed." (Oberlin Decl. Ex. 35, at 3.) Kubinski asked for specifics on when the OPABS training was offered, both before and after April 1, 2013, and stated: "I can do the training on my return to work, which is an arrangement that complies with the 'settlement agreement'. However, I do understand the impasse of having to do the training before being authorized to teach the OPABS courses. I am certainly open to any ideas/suggestions you have." (Oberlin Decl. Ex. 35, at 2.)

In an email to Plinski dated February 4, 2013, Keith requested input on the appropriate response to Kubinski. (Oberlin Decl. Ex. 35, at 2.) Keith acknowledged the Agreement provided that "training will begin upon his return" and offered to inquire into OPABS training available in early April, 2013. (Oberlin Decl. Ex. 35, at 2.) Plinski reminded Keith Kubinski was expected to

be trained before he steps into class and that OPABS is a very different model from what Kubinski had taught before, but suggested Keith ask about OPABS training in early April as a reasonable accommodation to Kubinski and his schedule. (Oberlin Decl. Ex. 35, at 1-2.) Two days later, Plinski again identified the "dilemma" resulting from the provision in the Agreement requiring the College to provide Kubinski with required training upon his return to work and the requirement Kubinski be OPABS trained before starts teaching. (Oberlin Decl. Ex. 35, at 1.) Plinski rejected Keith's suggestion the Agreement be renegotiated to allow Kubinksi to receive OPABS training in Spring, with three or four days compensation, and then return to teach Fall Term 2013, noting a desire for Kubinski to have at least one year of teaching to allow for first-year tenure evaluations. (Oberlin Decl. Ex. 35, at 1.) She explains: "Not having this training prior to starting OPABS classes could have a deleterious impact on his performance spring term. I would think he would do everything possible to get that training before stepping back into the classroom." (Oberlin Decl. Ex. 35, at 1.)

In a letter dated February 18, 2013, the College officially offered Kubinski a full-time teaching position from April 1, 2013, to June 30, 2013. (Oberlin Decl. Ex. 30.) In the letter, Blessing describes Kubinski as "very qualified for the teaching position," noting he holds a Masters and Doctorate of Education and has considerable experience teaching for community colleges. (Oberlin Decl. Ex. 30.) The letter allowed Kubinski to successfully obtain a work visa authorizing him to enter the United States on April 1, 2013. (Kubinski Dep. 129:20-130:5; Blessing Dep. 15:7-18.)

The same day, Keith sent an email to Kubinski advising him "the state does not permit teaching OPABS without being trained first," resulting in the expectation Kubinski will complete

OPABS training "prior to facilitating the lessons in the curriculum." (Oberlin Decl. Ex. 32, at 1.) Keith informed Kubinski the College had arranged for him to participate in Pre-bridge and Bridge training for Reading, Math, and Writing the weeks of March 11, 2013 and March 18, 2013, and would provide specific dates and times as they were confirmed. (Oberlin Decl. Ex. 32, at 1-2.) Keith explained the training will provide more options and flexibility allowing Kubinski to have a manageable schedule and that the College would provide Kubinski insurance coverage while in training. (Oberlin Decl. Ex. 32, at 2. ) Additionally, Keith again asked Kubinski to inform him by Wednesday, February 20, 2013, of the sections he was interested in teaching. (Oberlin Decl. Ex. 32, at 2. )

On February 20, 2013, Kubinski, in what appears to be an email to Keith, complained about the short notice (thirteen business days before the OPABS training), the lack of specific dates and times for the OPABS classes, his inability to fly to Portland on a moment's notice, and the possibility the dates may not be feasible in any event. (Oberlin Decl. Ex. 32, at 3.) He requested clarification on who would cover his expenses during the two-week training period and offered that, logistically, the College may need to extend his contract to cover from March 11, 2013, onward. (Oberlin Decl. Ex. 32, at 3. ) He expressed concern with regard to the relatively few OPABS classes remaining unfilled, and requested examples of possible work schedules based on instructor vacancies and the tentative OPABS training as well as teaching options available to him outside of OPABS courses, which he thought had been agreed to in December. (Oberlin Decl. Ex. 32, at 3. ) In conclusion, he mentioned a solution which "would resolve this O[P]ABS training and scheduling problem quickly and effectively" but would not reveal the option before receiving a response to his questions, which he requested within forty-eight hours. (Oberlin Decl. Ex. 32, at 3. )

At his deposition, Kubinski explained the solution was to have the College issue an amended letter of employment indicating his employment would commence on March 11, 2013, rather than April 1, 2013, but that he never asked the College for such a letter. (Kubinski Dep. 128:19-129:2; 131:5-9.) Had he received an amended employment letter from the College, Kubinski would have applied for an amended visa, taken the amended employment letter to the border, and been interviewed at the border, which would have taken a few days. (Kubinski Dep. 130:6-22.) In the past, the College had sent a letter overnight to Kubinski, who was then able to obtain a work visa over a weekend and arrive for his teaching assignment in a fairly short period of time. (Gattman Dep. 18:12-22.) Sharon Gattman, a generalist in the College's Human Resources Department ("Gattman"), was prepared to send Kubinski an amended letter with the new start date which would have allowed Kubinski to attend the OPABS training, and was just waiting to receive a firm start date. (Gattman Dep. 17:7-20; 18:1-7.) Additionally, the College agreed to pay Kubinski for his time spent in the OPABS training classes, in addition to the providing health insurance during this period. (Plinski Decl. ¶ 5.)

In a February 27, 2013 email to Keith, Kubinksi inquired about alternative courses that could be assigned to him if he was could not attend OPABS training in March. (Oberlin Decl. Ex. 36, at 4.) Keith informed Kubinski the Agreement provided he will be hired to teach ABE-GED classes and as the College is now teaching only OPABS ABE-GED classes, no alternative courses were available. (Oberlin Decl. Ex. 36, at 3.) In emails dated February 27, and March 1, 2013, to Keith, Kubinski sought clarification that if he failed to attend the OPABS training, the College would not offer him a teaching position in Spring 2013. (Oberlin Decl. Ex. 36, at 2. ) Keith advised Kubinski on March 8, 2013, the OPABS training had been pushed back to March 13, 2013, and that Kubinski

needed to confirm his attendance at all of the upcoming OPABS classes by March 11, 2013, at 8:00 a.m. (Oberlin Decl. Ex. 36, at 2; Keith Decl. ¶ 3.) Kubinski again requested a "yes or no" answer to the question posed in this earlier emails with a 5:00 p.m. deadline. (Oberlin Decl. Ex. 36, at 1.) On March 12, 2013, Kubinski advised Keith he would not be attending any of the OPABS training. (Keith Decl. ¶ 4.) Kubinski admitted in his deposition he could have attended the OPABS training but would have liked to be given more time. (Kubinski Dep. 141:1-6.)

On March 22, 2013, Gattman informed Kubinski by email the College had been unable to secure a Spring term 2013 position for him "because it was incumbent on you receiving OPABS training which you have not yet received. The only classes we have available for you to teach require you to have OPABS training." (Oberlin Decl. Ex. 41.) Accordingly, the College nullified the letter provided to allow Kubinski to secure a work visa. (Oberlin Decl. Ex. 41; Keith Decl. ¶ 5.) The same day, Keith advised Plinski, Gattman, and Goldberg, after "thinking this through a little more, Chris doesn't need all of that training to make load Fall term" but "would need to continue his training or his options will be limited to what he has been trained in." (Oberlin Decl. Ex. 37.) Keith noted six to eight hours each in Pre-Bridge Math, Writing, Reading "would be a good start." (Oberlin Decl. Ex. 37.)

Kubinski reported for work at the College the morning of April 1, 2013, and was advised the College could not offer him a teaching assignment or the training necessary to reinstate him. (Oberlin Decl. Ex. 39.) On April 16, 2013, Plinski addressed the following letter to Kubinski:

> On March 27, 2013, Mt. Hood Community College sent you an Addendum to Settlement Agreement based on your recommendation that we extend the conditions of your return to work until Fall term, 2013. In that notification, we communicated our expectation that you sign and return the addendum to us by April 1, 2013.

> Unexpectedly, we met with you on April 1, 2013, when you appeared for work, despite emails and correspondence confirming that you could not teach ABS/GED classes without OPABS training.
>
> On April 1, 2013, we presented you with an additional copy of the Addendum to Settlement Agreement, asking for an immediate signature confirmation of the terms of the Addendum. We have not yet seen this confirmation and, in fact, have heard nothing further from you since your unexpected visit on April 1, 2013.
>
> Consequently, without signature confirming your agreement to this Addendum to Settlement Agreement, the College must determine that you do not intend to comply with the extended conditions as outlined in the Addendum. Resultantly, this Addendum with extended return conditions is withdrawn, effective April 15, 2013.

(Oberlin Decl. Ex. 38.)

In the fall of 2013, the College created a research position for Kubinski which would allow him to work at the College during the 2013-2014 academic year even though he had not completed OPABS training. (Plinski Decl. ¶ 7.) Kubinski felt he was in no condition to work at the College and submitted a series of doctor's notes to the College effectively excusing Kubinski from work the entire academic year. (Kubinski Dep. 207:3-9; Plinski Decl. ¶ 7.)[7]

In a memorandum dated October 23, 2013, Goldberg advised Plinski the Adult Basic Skills division "determined that currently there is insufficient information to make a decision on moving Chris forward in the tenure track process" which was consistent with Plinksi's tenure recommendation of January 6, 2012. (Oberlin Decl. Ex. 23, at 1.) Goldberg explained Kubinksi had been on the tenure track since 2011 and, during this time, had "become more familiar with the campus program and taught various writing and math ABE-GED classes" but that the majority of his employment, from 1999 to 2009, was as a non-tenure track faculty member teaching at the

[7]Kubinski also expressed some concern the research position would not qualify him for a work visa. (Kubinski Dep. 207:18-22; Blessing Dep. 160:4-9.)

Inverness Jail. (Oberlin Decl. Ex. 23, at 1.) Despite receiving an extension to provide additional documents for his portfolio, Kubinski merely forwarded a portfolio letter indicating the portfolio remained incomplete for various reasons. (Oberlin Decl. Ex. 23, at 1.) Goldberg noted evaluation of the portfolio by the tenure track committee and faculty peer group played a large part in moving the candidate forward in the tenure-track process. (Oberlin Decl. Ex. 23, at 1-2.) He concluded: "Without any evaluation of Chris's instruction over the past five years, no review of course materials, no student evaluations, no tenure-track observations and feedback, and no dean's evaluation since 2005-2006, I have limited information or documentation upon which to recommend Chris for tenure." (Oberlin Decl. Ex. 23, at 2.) Kubinksi again did not receive tenure at this time.

In late October 2013, D. Moore responded to a request from Keith regarding upcoming OPABS training. (Oberlin Decl. Ex.19.) D. Moore acknowledged the "special OPABS training" previously arranged for the College "was a precedent for the State" made possible by existing OPABS trainer contracts and training schedule and the College's payment for the "site-specific training." (Oberlin Decl. Ex. 19.) When Keith forwarded D. Moore's email to Goldberg, his sole comment was "Kubinski crap?" (Oberlin Decl. Ex. 19.)

In mid-June 2014, Keith advised Goldberg the College was out of OPABS-trained faculty and was not receiving applications for the part-time pool due to the requirement of OPABS training. (Oberlin Decl. Ex.42, at 2.) Rather than remove OPABS training as a minimum qualification, which would force the College to offer Kubinski a position, Keith suggested eliminating some of the classes. (Oberlin Decl. Ex. 42, at 2.) Keith also identified July 23, 2014, as the last day Kubinski could initiate a discrimination action against the College. (Oberlin Decl. Ex.42, at 1-2.) Because the classes to be cancelled were limited to those offered Spring term 2014 and Kubinski's deadline

would expire soon, Goldberg recommended maintaining OPABS training as a minimum qualification, cutting the College's losses, and saving the budget for the following year. (Oberlin Decl. Ex.42, at 1.) Goldberg also bet "the lawsuit comes in July 22nd or 23rd. I'd put money on it. It never ends with Kubinski." (Oberlin Decl. Ex.42, at 1.) Kubinski filed this action on July 19, 2014.

The College again offered Kubinski a position in the fall of 2014. (Plinski Decl. ¶ 7.) Kubinski did not respond to that offer. (Plinski Decl. ¶ 7.) As of May 27, 2015, the College considered Kubinski an employee. (Plinski Decl. ¶ 7.)

*Legal Standard*

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2013). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2013). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

I. Retaliation Claims

Kubinski's federal and state retaliation claims are based on his complaints about: (1) Coleman's harassment in late 2008 ; (2) the College's inflation of student attendance data in late 2008; and (3) the College's breach of its contract with the County in early 2009. Kubinski complained about the improper report of student hours twice, once to the College and the Association in late 2008, and once to the Hotline in early 2013. Otherwise, all of his complaints were made in late 2008 to mid 2009. Kubinski alleges Defendants[8] retaliated against him by

[8]Kubinski agreed to the dismissal of the First Amendment claim against the College.

subjecting him to a hostile environment and refusing to offer him a position for Spring term 2013 in violation of his rights under the First Amendment and Oregon Revised Statutes 659A.203 and 659A.199.

Defendants move for summary judgment on the retaliation claims, arguing the 2008-2009 complaints are too remote from the alleged retaliatory actions to establish the requisite causal connection and Kubinski failed to establish the Defendants were aware of the 2013 complaint. Kubinski argues Defendants engaged in continuing retaliatory conduct from the time of his initial complaints through April 2013, labeling him a "pariah" and looking for any reason to terminate his employment and make his life miserable, justifying the application of the continuing tort doctrine. Kubinski relies on Defendants' alleged sabotage of the tenure process, manufacturing of training requirements, failure to provide an amended employment letter, and general acts of hostility toward Kubinksi, as evidence of such conduct.

*A. Statutes of Limitation*

1. Section 1983 Claim

42 U.S.C. § 1983 provides, in pertinent part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Kubinski alleges Defendants violated his right to freedom of speech under the First Amendment when they retaliated against him because he reported allegedly improper conduct of the College. Section 1983 actions are governed by the forum state's statute of limitations for personal injury actions. *Wilson v. Garcia*, 471 U.S. 261, 276 (1985). Thus, Oregon's two-year statute of limitations

for personal injury actions, found in OR. REV. STAT. 12.110, applies to plaintiff's claims in this case. *See, Cooper v. Ashland*, 871 F.2d 104, 105 (9th Cir. 1989). Kubinski filed this action on July 19, 2014. Accordingly, Kubinski's Section 1983 claims based on conduct occurring before July 19, 2012, are time-barred.

2. State Retaliation Claims

Kubinski alleges the College retaliated against him for reporting what he believed to be violations of law in violation of OR. REV. STAT. 659A.199 and 659A.203. This court has previously held claims for whistleblower retaliation based on violations of the Oregon statues brought by public employees are subject to the time limitations found in the Oregon Tort Claims Act (the "Act") and OR. REV. STAT. 659A.875(1). *Shephard v. City of Portland*, 829 F. Supp. 2d 940, 957 (D. Or. 2011).

The Act requires that a "notice of claim" be given the public body "within 180 days after the alleged loss or injury." OR. REV. STAT. 30.275(2)(b) (2013). Kubinksi alleges he provided Defendants with notice of his tort claims on our about May 30, 2013. (First Am. Compl. ¶ 4.) Consequently, Kubinski may not rely on circumstances which occurred prior to December 1, 2012. OR. REV. STAT. 659A.875(1), which provides that a civil action alleging an unlawful employment practice, such as whistleblower retaliation, "must be commenced within one year after the occurrence of the unlawful employment practice," is even more restrictive. Based on this limitation, Kubinski may rely only on alleged retaliatory actions occurring after July 19, 2013, in support of his state whistleblower retaliation claims.

*B. Continuing Harm/Hostile Work Environment*

Kubinksi appears to argue the court, based on his allegations of hostile environment and

evidence the individual defendants deviated from College policy with respect to the tenure process and application for a work visa, the court should apply the continuing tort doctrine to his retaliation claims. "When a tort involves continuing wrongful conduct, the statue of limitations doesn't begin to run until that conduct ends." *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002).

Under both federal and Oregon law, the doctrine applies only where there are no discrete acts or incidents that can fairly be identified as the cause of the identified harm. The United States Supreme Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). The Court explained "each discrete discriminatory act starts a new clock for filing charges alleged that act." *Id*. The Court identified termination, failure to promote, denial of transfer or refusal to hire as discrete acts which "constitute a separate actionable 'unlawful employment practice.'" *Id*. The Court then acknowledged hostile environment claims, which by their very nature occur over a series of days, weeks or months, are viable when an act contributing to the claim falls within the applicable filing period. *Id*. at 116-7. Similarly, the Oregon courts distinguish between a continuing course of conduct that involves discrete acts, each of which would be actionable separately, and a series of acts constituting a continuing tort. *See Boardmaster Corp. v. Jackson County*, 224 Or. App. 533 (2008).

Kubinski alleges his reports of the College's misconduct in 2008, 2009, and 2013 were a "substantial motivating factor in Defendants' decision to not allow Plaintiff to return to work pursuant to the Agreement and to subject Plaintiff to a hostile work environment." (First Am. Compl. ¶ 31.) Defendants' alleged refusal to allow Kubinski to return to work in April 2012 is a discrete discriminatory act and, therefore, not subject to the continuing-tort theory. As this conduct

falls outside both the two-year statute of limitations for Kubinsi's Section 1983 claim and the one-year statute of limitations for his state whistleblower retaliation claims, Kubinski is barred from relying on this retaliatory conduct in support of such claims.

Kubinski also identifies the College's placing Kubinski on administrative leave in January 2009, not renewing Kubinski's contract for the 2009-2010 academic year in March 2009 and for the 2012-2013 academic year in March 2012, failing to recall Kubinski for a position in 2010, and denying Kubinski's tenure application in early 2012 as evidence of continuing harm. These are also discrete acts which constitute separate actionable unlawful employment practices and do not support a continuing harm argument. As all occurred prior to the relevant statute of limitations periods, they are not relevant to this action.

Kubinski's allegations of a generally hostile environment are equally unavailing. To survive summary judgment on a hostile work environment claim, a plaintiff must "establish a pattern of ongoing and persistent harassment severe enough to alter the conditions of employment." *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 981 (9th Cir. 2001). The harassment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). Courts should consider: the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance. *Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993).

Kubinski alleges Coleman continually harassed him, causing him to suffer severe mental stress culminating in intermittent medical leave in Fall 2008. Kubinski testified his relationship with

Coleman was "very poor" from the very beginning, and was sufficiently offensive to cause Kubinksi to file a harassment greivance against Coleman in September, 2008. Coleman's conduct occurred prior to the filing of Kubinski's first grievance and, therefore, can not be considered retaliatory conduct based on the filing of a grievance, Kubinski's alleged protected act. This conclusion is further supported by evidence Coleman harassed other employees who apparently had not filed similar grievances.

The only other evidence of harassment is communications between College employees containing less than positive comments about Kubinski. Kubinski fails to establish he was aware of these comments before he filed this action. Accordingly, the communications could not have been perceived by Kubinski as offensive, hostile or abusive, or have affected Kubinski's work performance in any way. Furthermore, Kubinski identifies only eight passing comments made over a period of more than a three years. These communications were not ongoing, persistent, or severe enough to create a hostile environment. While these communications may be evidence Kubinski's supervisors and fellow employees did not like him or want him to be successful at the College, such evidence is relevant to a discriminatory motive, not of continuing harm based on a hostile work environment. Kubinski has failed to establish the College's actions constitute the hostile environment required to support application of the continuing harm doctrine.

*C. Causation*

The court is limited to considering retaliatory conduct occurring after July 2012 with regard to Kubinski's Section 1983 claim and, at the most, after December 2012 with regard to his state whistleblower claims. After July 2012, the parties entered into the Agreement and were unable to reach consensus on the classes Kubinski could teach Spring term 2013, Kubinski was unable to

accept a position for the 2013-2014 academic year due to medical issues, and the College denied Kubinski's application for tenure in late 2013 based on insufficient observations, feedback, and evaluations. The court must now consider whether these alleged retaliatory acts provide the requisite support for Kubinki's retaliation claims.

To state a *prima facie* claim for retaliation based on protected speech under both Section 1983 and the relevant state statutes, Kubinski must establish the College's retaliatory conduct was caused by Kubinski's protected activity. In other words, Kubinski must show his reports of improper conduct by the College in 2008, 2008, and 2013, were a substantial or motivating factor for the College's adverse employment actions. *See Desrochers v. City of San Bernadino*, 572 F.2d 703, 709 (9th Cir. 2009)(element of First Amendment retaliation claim is "whether the state would have taken the adverse employment action even absent the protected speech"); *Larmanger v. Kaiser Found. Health Plan of the Nw.*, 895 F. Supp. 2d 1033, 1049 (2012)(to establish *prima facie* claim under Oregon whisteblower statutes, plaintiff must show the protected activity was a substantial factor, or a factor that made a difference, in the motivation to engage in the adverse employment action).

A plaintiff may show retaliation was a substantial or motiving factor by introducing evidence of: 1) proximity in time between the protected speech and retaliatory conduct; 2) expressions to the plaintiff or others indicating the employer's opposition to the protected speech; or 3) the falsity of the employer's stated reasons for the retaliatory conduct. *Coszalter v. City of Salem*, 320 F.3d 963, 977 (9th Cir. 2003); *Huber v. Oregon Dept. of Educ.*, 235 Or. App. 230, 241 (2010)(close temporal proximity between employer's discovery of protected speech and adverse employment action supports inference impermissible motive was substantial factor in retaliatory conduct). Defendants contend Kubinski has failed to establish a temporal relationship between his reports of wrongdoing

in 2008 and 2009, and the alleged retaliatory conduct occurring after July 19, 2012.

Where a plaintiff is relying solely on temporal proximity to establish a causal connection, courts uniformly hold the proximity must be very close. *Clark County School. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)("Action taken (as here) 20 months later suggests, by itself, no causality at all.) The Ninth Circuit has held "[a]n eleven-month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory." *Allen v. Iranon*, 283 F.3d 1070, 1078 (9th Cir. 2002). Here, the gap between the 2008 and 2009 protected activity and the first relevant retaliatory conduct in July 2012, is more than three years. The extended time period does not establish a causal connection between the protected speech and the adverse employment actions.

While Kubinksi has presented evidence Defendants did not necessarily like him or want him to continue teaching at the College, there is no evidence these feelings were related to Kubinski's protected speech. In fact, Goldberg explains in his deposition that the derogatory comments he made in 2011 were based on Kubinksi's success in the 2011 arbitration relating to the College's failure to recall Kubinski and resulting need to change to staffing structure to accommodate Kubinski, not the 2008 and 2009 reports of wrongdoing. Additionally, Kubinski has failed to offer any evidence Defendants' proffered reasons for its adverse employments actions were false or pretextual.

With regard to Kubinski's report to the Hotline in February 2013, Defendants all deny knowing about the report prior to the filing of this action and Kubinski has failed to present evidence Defendants had knowledge of such report. In the absence of such knowledge by Defendants, there is no evidence to establish the alleged retaliatory conduct was in any way motivated by, or causally connected to, Kubinski's reports of wrongdoing to the Hotline. *Kayser v. Sacramento City Unified School. Dist.*, 265 F.3d 741, 751 (9th Cir. 2001)("[T]here is no evidence in the record to contradict

Sweeney's statement in his declaration that he was unaware that Cisneros had made such allegations until this lawsuit was filed. Therefore, there is no evidence that Sweeney was motivated to reassign Cisneros because of the allegations he made. Thus, we conclude summary judgment against Cisneros on his First Amendment claim was appropriate."); *McGuire v. Jackson Educ. Serv. Dist.,* 204 Or. App. 429, 430 (2006)(in absence of evidence employer had knowledge of protected activities, requisite causal link between adverse employment action and protected conduct does not exist).

*D. Conclusion*

The continuing harm doctrine is not applicable to Kubinski's claims for retaliation. Under the relevant statutes of limitations, Kubinski may not rely on any alleged retaliatory conduct occurring before July 2012. Kubinski has failed to present evidence his protected speech was a substantial factor in the College's actions after July 2012. Defendants are entitled to summary judgment on Kubinski's First, Second, and Third Claims for Relief for whistleblower retaliation under Section 1983, OR. REV. STAT. 659A.203, and 659A.199, respectively.

II. Breach of Contract

In his Fourth Claim for Relief, Kubinski alleges the College breached the Agreement when it refused to allow him to return to work on April 1, 2013. The College asserts Kubinski breached a condition precedent, or repudiated the Agreement, when he refused to attend OPABS training in March, 2013. The parties spent less than three pages cumulatively on this argument, providing the court with little insight on their respective positions with regard to the proper interpretation of the relevant language of the Agreement.

Generally, "[i]n a contract dispute, a party will be entitled to summary judgment only if the

governing terms of the contract are unambiguous." *Milne v. Milne Construction Co.*, 207 Or. App. 382, 388 (2006) (citing *Hauge v. Vanderhave*, 121 Or. App. 221, 225 (1993)). A contract provision is ambiguous where it is susceptible to "more than one plausible – that is, sensible and reasonable – interpretation." *Id.* (citing *Deerfield Commodities v. Nerco, Inc.*, 72 Or. App. 305, 317 (1985)). A court may refer to parol evidence to evaluate the ambiguity of a contract term. *Id*. (citing *Deerfield Commodities*, 72 Or. at 317). If the court finds that the contract term is genuinely ambiguous, the meaning of that term is a question of fact. *Id.* at 389 (citing *Hauge*, 121 Or. App. at 224).

The Agreement clearly provided "Dr. Kubinski will be reinstated and resume employment with MHCC effective with the beginning of Spring Term 2013." (Oberlin Decl. Ex. 29.) In early January 2013, Keith communicated with Kubinksi seeking his input on which ABE/GED classes he was interested in teaching Spring term 2013. In February 2013, the College offered Kubinski a full-time teaching position starting on April 1, 2013, which appears to be the first day of Spring term 2013. Kubinski reported to work at the College on April 1, 2013. It is evident the parties understood the Agreement required the College to provide Kubinski with a employment opportunity beginning on April 1, 2013. The parties disagree on the proper interpretation of the clause providing:

> Dr. Kubinski's assignment shall be in ABE/GED, exclusive of ESL or ENL. He will teach OPABS courses similar to his faculty peers in the ABE/GED program. The College will provide Dr. Kubinski with any required training upon his return to work, and he will not be required to teach any courses that he is not qualified to teach.

Oberlin Decl. Ex. 29.)

The College contends, and the Agreement clearly states, Kubinski would be limited to teaching OPABS ABE/GED classes. The question is the College's obligation to "provide Dr.

Kubinski with any required training upon his return to work." Was the required training to occur after Kubinski returned to work, or was Kubinski to complete the training required for him to return to work prior to such return?

The contract language is susceptible to two sensible and reasonable interpretations and is, therefore, ambiguous. This conclusion is supported by statements made by both parties. While offering to complete the OPABS training after he returned to work on April 1, an arrangement he described as complying with the terms of the Agreement, Kubinski acknowledged the "impasse" created by his having to complete the training before being authorized to teach the OPABS courses. Similarly, Keith acknowledged the Agreement provided training would begin on Kubinski's return, presumably on April 1, 2013, and Plinski characterized the inconsistency between the Agreement's requirement the College provide Kubinski with the necessary training upon his return to work and the requirement he be OPABS trained before he starts teaching as a "dilemna."

The parties have offered evidence to show their intent. At the time the Agreement was executed, Kubinski had completed two OPABS classes. He thought he would be able to teach certain classes immediately without completing the OPABS training. Based on this understanding, Kubinksi construed the language to require him to participate in additional OPABS training after he started teaching at the College on April 1, 2013. On the other hand, Defendants were aware Kubinski needed additional OPABS training to qualify him to teach the OPABS ABE/GED classes and expected him to complete that training before he started teaching at the College on April 1, 2013. "If a term is ambiguous, and parties submit competent evidence regarding their intentions, the meaning of the ambiguous terms becomes a question of fact for the jury to resolve." *Hauge*, 121 Or. App. at 224. Genuine issues of fact exist with regard to the proper construction of this language in

the Agreement.

The ruling is equally applicable to the College's arguments based on a condition precedent and repudiation. The College argues the parties intent that Kubinski receive OPABS training before he taught "naturally flows from the face of the contract, since no instructor could teach OPABS classes without being trained, and since the contract specifically provided that the plaintiff would teach OPABS classes." (Defs.' Mot. for Summ. J. at 13.) There is no disagreement Kubinski needed to receive OPABS training to teach OPABS training. However, the parties have offered differing ideas of when that training was to occur, both based on reasonable interpretations of the relevant language and evidence of their intent to support those interpretations. Accordingly, the College's assertion the Agreement created a condition that required Kubinski to complete his OPABS training before he returned to work on April 1, 2013, which Kubinski failed to satisfy, and thus relieved the College of its obligation to perform under the Agreement, is subject to a genuine issue of material fact. The College is not entitled to summary judgment on Kubinski's breach of contract claim.

*Conclusion*

Defendants' motion (ECF No. 26) is GRANTED with regard to Kubinski's First Claim for Relief based on violation of the First Amendment, Second Claim for Relief based on violation of OR. REV. STAT. 659A.203, and Third Claim for Relief based on violation of OR. REV. STAT. 659A.199, and DENIED with regard to Kubinski's Fourth Claim for Relief for breach of the Agreement.

DATED this 8th day of February, 2016.

/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge